IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

O&G LEASING, LLC and
PERFORMANCE DRILLING
COMPANY, LLC                                                                                                    PLAINTIFF

VS.                                             CIVIL ACTION NO. 3:14cv133-FKB

OKLAHOMA RIG FABRICATORS, LLC                                       DEFENDANT

**MEMORANDUM OPINION AND ORDER**

I. <u>INTRODUCTION AND PROCEDURAL HISTORY</u>

This action began as an adversary proceeding in bankruptcy court filed by Performance Drilling Company, LLC (PDC) and O & G Leasing, LLC, affiliated companies and Chapter 11 debtors-in-possession, asserting breach of contract and related claims. Defendant, Oklahoma Rig Fabricators, LLC (ORF), asserted a counterclaim for amounts allegedly due on invoices. Following an agreed withdrawal of the reference, the parties consented to jurisdiction of the undersigned. The bankruptcy reorganization left only PDC as the surviving company, and thus it is now the sole plaintiff herein. The matter was tried to the Court on April 6, 2016. Having considered the evidence and the applicable law, the Court makes the following findings of fact, based upon a preponderance of the evidence, and reaches the following conclusions of law, determining that Plaintiff is entitled to limited recovery on its breach of contract claim and that ORF is entitled to recovery on its counterclaim.

## II. SUMMARY OF CLAIMS ASSERTED

PDC is a Mississippi company engaged in the business of owning and operating oil and gas drilling rigs. An essential component of those rigs is a mud pump, which consists primarily of a pump and an engine. ORF is a fabricating company located in Oklahoma City, Oklahoma in the business of manufacturing and refurbishing drilling rigs and rig components. In late 2011, PDC and ORF entered into a contract whereby ORF agreed to fabricate two mud pump packages for PDC. PDC has asserted breach of contract and related claims arising from the sale of the pumps. The factual allegations underlying PDC's claims are that the pumps were not delivered on time, that the power units for the pumps were not new, and that the pumps did not operate properly.

In its counterclaim, ORF seeks payment on two invoices for repair work allegedly performed on equipment sent to it by PDC and two invoices for parts allegedly purchased by PDC. PDC denies that it ever requested the repairs or sent the equipment to ORF, and it likewise denies that it purchased the parts for which ORF seeks recovery.

## III. CHOICE OF LAW

A federal court sitting in diversity applies the choice-of-law principles of the forum state in order to determine which state's substantive law should apply. *Ellis v. Trustmark Builders, Inc.*, 625 F.3d 222, 225 (5th Cir. 2010). Mississippi's choice-of-law test consists of three steps: "(1) determine whether the laws at issue are substantive or procedural, (2) if substantive, classify the laws as either tort, property, or contract; and (3) look to the relevant section of the Restatement (Second) of Conflict of Laws." *Id.* at 225-26 (quoting *Hartford Underwriters Ins. Co. v. Found. Health Servs.,* 524 F.3d 588, 593 (5th Cir. 2008)).

The relevant section of the Restatement, § 188, requires a court to apply "the law of the place which has the most significant relationship to the event and parties or which, because of the relationship or contact with the event and parties, has the greatest concern with the specific issues . . . ." *Hartford*, 524 F.3d at 594 (quoting *Zurich Am. Ins. Co. v. Goodwin*, 920 So. 2d 427, 433 (Miss. 2006)). In this case, the law at issue is substantive and concerns contracts. Section 188 of the Restatement provides that the relevant considerations in determining which state has the most significant relationship to the transaction and the parties in a contract dispute include the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and "the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188(2)(a) - (e). In Mississippi, these factors are applied in a practical way to determine the center of gravity of the contract issues, and the contacts "are to be evaluated according to their relative importance with respect to [that] particular issue." *Hartford*, 524 F.3d at 595 (quoting Restatement (Second) of Conflict of Laws § 188).

Both parties assert that Oklahoma law applies in this action. An analysis of the relevant factors leads the Court to agree. PDC is a Mississippi limited liability company having its office in Mississippi. ORF is an Oklahoma limited liability company having its principal place of business in Oklahoma. The place of contracting the purchase of the pump packages was Oklahoma, as this is where PDC made its down payment, thereby placing its order for their fabrication. Negotiation of the contract appears to have been in both Mississippi and Oklahoma. The place of performance of the contract was Oklahoma,

3

and the location of the subject matter of the contract was Oklahoma. Because PDC's claims against ORF concern the performance of the contract, the place of that performance, that is, the place of manufacture and delivery of the mud pumps, is the most significant contact to be considered. Consideration of all of these factors leads the Court to conclude that Oklahoma has the most significant relationship to the parties and the issues in dispute in PDC's claims against ORF. Accordingly, Oklahoma law applies to these claims.

The counterclaim asserted by ORF concerns invoices for repairs which were allegedly performed at ORF's facility and for parts allegedly sold from there. Again, the primary issues are performance of the contracts, and for this reason, the Court concludes that Oklahoma law applies to the counterclaim as well.

## IV. PDC'S CLAIMS

The principals involved in the relevant events are as follows. David "Grumpy" Farmer is the president and CEO of PDC. During the relevant time period, Billy Bunch was PDC's vice president of operations. Bunch's responsibilities included keeping the rigs running, overseeing repairs, supervising drilling workers, and purchasing equipment and supplies. Bunch had actual authority to purchase items in the $5,000 to $10,000 range; for more costly items, he would obtain authority from Farmer. He did not have the authority to sign contracts or to write checks. Farmer and Bunch had a close working relationship and spoke with each other on a daily basis.

ORF's president and CEO is Mike Marshall. Steve Jones is a salesman at ORF, and Troy Rodgers is the head of ORF's fabrication shop.

PDC had been doing business with ORF since 2008. Through the time period relevant to this lawsuit, PDC's business with ORF was conducted primarily, if not exclusively, through Bunch.[1]

PDC's claims against ORF arise out of PDC's purchase of two mud pump packages from ORF. In 2011, PDC was operating several rigs, including its Rig 14, for Apache Corporation. At the time, Rig 14 operated with two 1000 horse power (hp) mud pumps. Apache expressed to PDC its desire for an upgrade to more powerful pumps. Apache made it clear to Farmer that it wanted the pump packages to contain all new equipment. In or around August of 2011, Bunch began preliminary inquiries with ORF and others concerning the fabrication of two 1600 hp pump packages. Bunch was at all times the only representative of PDC to have any communications or dealings with ORF with reference to the purchase and fabrication of the pump packages. Bunch's primary contact at ORF during the negotiation phase was Jones.

In September of 2011, Jones began sending Bunch quotes for two 1600 hp pump packages, each such quote being dated September 14, 2011, and set out on an invoice form. The final versions of the quotes were emailed to Bunch on October 10, 2011. Each of these quotes described the item as a new pump and power unit, consisting of an F1600 mud pump with a 3512 Caterpillar engine and having a belt drive, with a price of $675,000. The quotes stated that the pump packages would be delivered eight weeks after receipt of a firm order, with payment terms of fifty percent down and the remainder due upon completion prior to shipping.

---

[1] Mike Marshall testified that he had never dealt with anyone at PDC other than Bunch.

At some point in the process leading up to placement of PDC's order with ORF, it became apparent to Bunch and Jones that there were no brand new 3512 Caterpillar engines available that could be obtained within a reasonable time frame. Thus, they began to look for refurbished engines. Before PDC actually placed its order with ORF, Bunch located one refurbished engine and one low hour engine at S & W Power Systems (S & W) and approved the use of these engines in the pump packages. Bunch testified that he discussed the use of these engines with Farmer and that Farmer approved the inclusion of these engines, rather than new ones, in the pump packages. Farmer, on the other hand, testified that he did not know that a refurbished engine and a used engine were used until after the pumps were installed at Rig 14. For the reasons stated *infra*, the Court finds it unnecessary to resolve this conflict in the evidence.

The upgrade in the pumps on Rig 14 necessitated a new contract between PDC and Apache, and thus PDC waited until the new contract with Apache was signed before placing an order for the pump packages. The new contract was signed on or about October 14, 2011, and on October 21, 2011, PDC placed its order with ORF by wiring to ORF the deposit amount of $675,000.

Over the next several weeks, ORF fabricated the pump packages. During this period, Bunch traveled to ORF on several occasions to check on their progress. A significant change to the order was made when PDC modified the order to specify chain drives instead of belt drives. It is unclear precisely when Bunch informed Jones of this change, but he did so at least by November 4, 2011. ORF initially considered purchasing

6

the chain drives from a supplier, but it ultimately decided to build them in-house. This change added at least two or three weeks to the fabrication time.

Farmer testified that time was of the essence and that he expected the pump packages to be delivered eight weeks after payment of the deposit, as indicated on the quote. However, there is no evidence that Farmer ever communicated this expectation to ORF, as only Bunch ever dealt directly with ORF concerning the order. Although Bunch told ORF throughout the process that he needed the pump packages as soon as possible, he never communicated to ORF that there was a firm deadline.

On December 2, 2011, ORF sent to PDC an invoice for the remaining balance of $675,000. PDC wired this payment to ORF on or around December 14, 2011. However, on January 16, 2012, Jones sent an email to Bunch informing him that a balance was still due and that the pump packages could be shipped once all invoices had been paid. Included with the email were two invoices for $30,000 each, representing the change on each pump package from a belt drive to a chain drive - the change that had been requested by Bunch. Farmer testified that even though the additional $60,000 charges came as a surprise, PDC paid them, along with the remaining balance that was due, as PDC was "under the gun" because of Apache's demands. PDC paid the $60,000 on January 18, 2012, and the new pumps were then shipped to Rig 14 in west Texas.

Once installed on the rig, the pumps did not operate properly. The initial problem was that the engines' wiring harnesses had not been configured properly by S & W. As a result of this problem, the pumps and the rig were completely nonfunctional from January 24, 2012, until 10:00 a.m. on February 2, 2012. Thereafter, the chain boxes fabricated by

7

ORF leaked and had to be rebuilt, and the piping in the torque converters, a water pump, and a sprocket on a chain drive had to be replaced. Over the next several months, S & W and other companies made numerous adjustments and repairs, the costs of which were paid by PDC.

Plaintiff seeks damages from ORF based upon (1) breach of the implied warranty of merchantability, (2) breach of express warranty, (3) breach of contract, and (4) breach of the duty of good faith and fair dealing.[2]  Several of the terms of the agreement or modifications to it were negotiated by Bunch without Farmer's express approval; thus, a threshold issue to be resolved relevant to several of PDC's claims is the nature and extent of Bunch's authority. Both Farmer and Bunch denied that Bunch had actual authority to enter into the contract for the purchase of the pump packages or to make substantial modifications to that contract.  Thus, the question is whether Bunch had apparent authority to make an agreement with ORF or to substantially modify that agreement.

Under Oklahoma law, apparent authority will be found when a principal has manifested his consent to the exercise of the authority by his agent or has knowingly permitted it, resulting in the reasonable belief by a third party that the agent actually possesses the authority.  *See Wheeler v. Puritan Ins. Co.,* 720 P.2d 729, 731 (Okl. 1981). The determination of the apparent authority of an agent is to be made by consideration of all the facts and circumstances in evidence. *Id.*

---

[2]PDC dismissed prior to trial its claims for § 542 turnover of property and accounting, conversion, trespass to chattel, and fraud.  Its claims for negligent misrepresentation and intentional misrepresentation were not included in its proposed findings of fact and conclusion of law, and are therefore considered abandoned.

The evidence supports a finding of apparent authority in the present case. PDC initially negotiated the agreement with ORF entirely and solely through Billy Bunch. He was the only individual from PDC with whom anyone at ORF ever dealt. Based solely upon Bunch's negotiations and representations, PDC paid the fifty percent down payment. Throughout the entire process, neither Farmer nor anyone else from PDC, other than Bunch, ever communicated directly with ORF. The result of PDC's placement of Bunch in the position of sole voice and face of PDC is that PDC is bound by Bunch's actions:

> It is the law in Oklahoma that apparent authority exists when the principal, by statement or conduct, either places the agent in position in which he appears with reasonable certainty to be acting for the principal, or without interference suffers the agent to assume such position so that third persons are justified in believing that he is acting within his authority.

*Phillips Petroleum Co. et al., v. The Hitch Land and Cattle Co.*, 241 F.2d 178, 182-83 (10th Cir. 1957). By allowing Bunch, without interference, to conduct negotiations with ORF and to be PDC's sole contact with ORF, PDC placed Bunch in a position in which he appeared with reasonable certainty to be acting on behalf of PDC.

PDC argues that the requirements of apparent authority have not been met because it was not reasonable for ORF to believe that Bunch had the authority to make and alter the contract concerning the purchase and fabrication of the pump packages. Plaintiff's argument is based upon its theory that during the negotiation and fabrication process Bunch was actively working in the interest of ORF, rather than PDC, and that ORF knew this. An understanding of this argument and Plaintiff's allegations regarding Bunch requires a brief summary of the events that occurred in 2012 with regard to PDC's bankruptcy proceeding.

9

In October of 2011, the bankruptcy court entered an order setting forth a procedure for the sale of PDC's assets. Those procedures included a confidentiality agreement, which potential buyers were required to sign prior to bidding on the assets. The agreement forbade the bidder from initiating contact with PDC's suppliers and customers and from soliciting or hiring any of PDC's employees. In January 2012, Canyon Drilling Company (Canyon) signed the agreement. The majority stockholder of Canyon is Mike Marshall, the CEO of ORF.

In July of 2012, Bunch left PDC and went to work for Canyon. In August of 2012, PDC filed for injunctive relief in the bankruptcy court, alleging that Canyon had violated the confidentiality agreement by soliciting and hiring its employees and by soliciting business from PDC's customers. The bankruptcy court ruled in favor of PDC. The upshot of the bankruptcy court's findings with regard to Bunch is that beginning in January of 2012, Bunch was involved in helping Canyon solicit PDC's customers and that in June of 2012, while he was still working for PDC, Bunch attempted to solicit PDC employees to work for Canyon. Farmer's testimony at trial revealed that after Bunch left PDC for Canyon, he took two employees with him and that he hired, on behalf of Canyon, five crew members off of PDC's Rig 14. As further evidence of Bunch's disloyalty to PDC, Farmer testified concerning an email string, a copy of which was admitted into evidence, that indicated that in late January of 2012, Bunch forwarded to Apache information he received from Canyon regarding Canyon's rig inventories.

PDC's theory is that Bunch was actively working against PDC even earlier than January of 2012 and, particularly, during the fall of 2011 when the contract with ORF was being negotiated and modified, that Marshall and ORF knew this, and that therefore ORF

could not reasonably have believed that he was acting as the agent of PDC. PDC attempted to show that Bunch was working against PDC's interests in October of 2011 by placing into evidence an email string between Bunch and Marshall dated October 18-19, 2011. The string begins with an email from Marshall with drawings for draw works. Bunch responds with an email stating, "It won't work to [sic] long." Marshall then states, "Ok u want me to keep looking." Bunch then replies as follows: "No im going to patch, so it will cost more at a later date." Farmer testified that to him, Bunch's last response indicated that Butch was choosing a course of action, that is, patching PDC's present equipment, rather than purchasing new equipment, for the deliberate purpose of causing PDC to incur more expense. The Court finds that the email string is too ambiguous for the drawing of such a conclusion.

But even if ORF knew or suspected that Bunch was acting not to benefit PDC, but, rather, to benefit himself and/or Canyon and Marshall, this situation would not be inconsistent with Bunch's having authority to act on behalf of PDC. And ORF's belief that Bunch had such authority would not have been unreasonable. Furthermore, PDC has identified nothing in the agreement for the fabrication of the pump packages that was unfair or that would otherwise have caused ORF to believe that Bunch was acting against PDC's interests. Bunch's actions with reference to the contract, and PDC's delegation of the entire process to Bunch, made it reasonable for ORF to believe that Bunch had full authority to negotiate and modify the mud pump package contracts. PDC will not be heard to claim the benefits of Bunch's negotiation of the agreement and overseeing the fabrication of the pumps while at the same time denying that Bunch had the authority to carry out those actions. The undersigned concludes that Bunch had apparent authority to

11

act on behalf of PDC in all matters concerning the contract for the mud pumps and that his actions were binding on PDC.

*Breach of Implied Warranty of Merchantability.*  Under Oklahoma law, a contract for the sale of goods by a merchant includes a warranty that the goods are fit for the ordinary purposes for which they are used.  Okla. Stat. tit. 12A § 2-314 (1971).  This warranty requires, "at the very least, that goods operate for their ordinary purpose."  *Perry v. Lawson Ford Tractor Co.*, 613 P.2d 458, 463 (Okla. 1980).  The failure of the mud pumps to operate properly for several weeks after their installation constitutes a breach of this implied warranty.

*Breach of Express Warranty.*  The essence of PDC's claim of breach of express warranty is that ORF warranted that the pump packages, including the engines, were new, when in fact one was used and one was rebuilt.  The Court rejects this claim.  While the initial quote for the pump packages states that the engines would be new, that requirement was changed by PDC, acting through Bunch, before PDC placed its order with ORF.  In fact, Bunch is the person who actually located the engines installed in the pump packages, and he approved the change.  Furthermore, PDC has not alleged any specific damage, such as payment of an unreasonably high price, that it suffered as a result of the inclusion of the used and refurbished engines.  The real problem for PDC was not that the engines were not new, but that they did not work properly.  Accordingly, this claim fails.

*Breach of Contract.*  PDC asserts that ORF breached the agreement by failing to deliver the pump packages within eight weeks of PDC's initial payment.  PDC relies on the language in the quote as the basis for this claim.  But the Court has found that Bunch had

the apparent authority to modify this term, and the Court likewise finds that he did so. By his actions, Bunch made it clear to ORF that while he wanted the pump packages as soon as possible, he did not necessarily expect them eight weeks after the down payment. Furthermore, Bunch requested that the type of drive be modified from belt to chain, thereby necessitating a delay, and at one point he asked that ORF's shop stop work on the pump packages in order to perform other work for PDC.  In summary, the Court finds that the initial contract term of delivery within eight weeks of the down payment was modified such that there was no firm date for ORF to deliver the pump packages.

*Breach of Duty of Good Faith and Fair Dealing*.  Under Oklahoma law, every contract includes an implied duty of good faith and fair dealing.  *Wathor v. Mutual Assurance Administrators*, 87 P.3d 559, 561 (Okla. 2004).  But in ordinary commercial contracts, a breach of that duty results merely in damages for breach of contract, not independent tort liability.  *Id.*  In any event, PDC has identified no specific conduct which it claims constituted bad faith on the part of the ORF, and the Court finds none.

## IV. ORF'S COUNTERCLAIM

ORF's counterclaim is based upon four invoices to PDC for repair work and rig equipment.  The invoices are as follows, copies of which were admitted into evidence:

Invoice no. 3808, dated November 4, 2011, for repair and replacement of bearings and modules on F1000 pumps in the amount of $114,000.  One of the copies admitted into evidence bears the notation "Per John Hosey."

Invoice no. 3809, dated November 4, 2011, for repair and replacement of bearings and modules on F1000 pumps in the amount of $114,000.  One of the copies admitted into evidence bears the notation "Per John Hosey."

Invoice no. 3746, dated April 13, 2012, for a K5UL new air hoist and freight in the amount of $11,640.

>Invoice no. 3802, dated June 11, 2012, for a cent pump skidded and unitized with starter box in the amount of $13,000.

PDC claims to have received none of these items or services, and none of these invoices has ever been paid. The first notice that Farmer had of any of these invoices was a demand letter dated October 4, 2012. Farmer requested additional information and supporting documentation from ORF, but none was forthcoming.

*Invoices 3808 and 3809.* Marshall, Bunch, and Rogers testified concerning the two invoices for repairs to mud pumps allegedly performed by ORF in November of 2011. Marshall recalled that around the end of that month, while he was out of town, ORF performed an "ASAP" repair of two 1000 hp units for PDC at Bunch's request. According to Marshall, the pumps were shipped to ORF from another repair facility in Oklahoma City. Bunch's testimony was that he sent two pumps to ORF for repairs during the period of the fabrication of the new pump packages. At least one of the pumps, according to Bunch, was from Rig 22, which remained fully operational because PDC leased a pump from another vendor while the repairs were being made. Bunch also stated that he saw one of the pumps at ORF during a visit there during the fabrication period.

Rodgers provided specific supporting evidence regarding invoices 3808 and 3809. He recalled that during the fabrication of the pump packages, two pumps as described in the invoices were brought to ORF by a trucking company from Rick's Rig Service, another repair shop in Oklahoma City, where they had initially been sent by PDC for repairs. He testified that Marshall instructed him to pull his workers off of the fabrication project and to do the repair work on the F1000 pumps because PDC was in a bind for them. Rodgers gave detailed testimony concerning the repairs that were made to the pumps. According

14

to Rodgers, ORF had the two F1000 pumps in the shop for five-and-a-half or six days, with himself and five other men performing the repairs. When ORF completed the work, Bunch sent a trucking company to ORF to pick them up.

Farmer attempted to dispute the invoices. He argued that the invoices could not be correct because all of PDC's rigs were fully operational during this period.

One fact concerning these invoices is troubling. The evidence established that ORF's invoices are numbered sequentially. Under this system, an invoice originally created on November 4, 2011 - the date on invoices 3808 and 3809 - should have been assigned a number somewhere between 3596 and 3746.[3] Instead, the numbers on invoices 3808 and 3809 indicate that they were generated no earlier than June of 2012.[4] Thus, it appears that no invoices were generated for these expensive repairs contemporaneously with the repair work. However, a possible explanation for this situation can be inferred from the testimony of Steve Jones and Shelley Owen, ORF's secretary and bookkeeper. Their testimony revealed ORF to be a small, informal operation which may sometimes lack appropriate record-keeping. They also indicated that no one person is responsible for all invoices; rather, each salesman handles his own invoices. Owen acknowledged the possibility of an invoice's "slipping through the cracks." Furthermore, Jones testified that for an urgent repair of field equipment, there might not be any quote or invoice created at the time. Thus, it is plausible that no invoices were

---

[3]The evidence showed that invoice 3596, one of the pump package invoices, was dated September 14, 2011. The next sequential numbering of an invoice in evidence is invoice number 3746, the April 13, 2012 invoice to PDC for the air hoist.

[4]Invoice number 3802, the invoice to PDC for the cent pump, was dated June 11, 2012.

15

created at the time of the repairs. Marshall also indicated that there was a period during PDC's bankruptcy during which ORF provided PDC with credit. This also could account for the delay in billing.

Regardless of *when* the invoices were created, the Court must determine whether ORF has shown by a preponderance of the credible evidence that the repairs were made as described on invoices 3808 and 3809, and the Court concludes that ORF has met its burden. Rodgers' testimony as to the repairs on the two pumps was credible and convincing, and PDC presented no convincing evidence that these repairs were not made. Farmer's testimony that the invoices could not have been correct is unconvincing in light of the possibility that replacement pumps were leased while the repairs were being made. Further, Bunch confirmed that PDC sent these two pumps to ORF for repairs and that he had seen one of them at ORF's shop. ORF is entitled to judgment on its claim for payment of these invoices.

*Invoices 3746 and 3802.* Bunch testified that he authorized John Hosey to order the item described in invoice 3746 after discussing it with him, and he testified that the item was received PDC. Concerning invoice 3802, Bunch testified that he ordered the items and that initially there were problems with the starter box PDC received. As a result, Jones, at the request of Bunch, sent PDC a replacement, along with extra wiring and lead. Jones testified that he sold to PDC the parts described in the invoices, and in his testimony, he recounted several specific details about the sales. The Court finds, based upon the testimony of Bunch and Jones, that the parts represented by invoices

16

3746 and 3802 were purchased by PDC and that ORF is entitled to payment for these invoices as well.

## V.  DAMAGES

Farmer testified concerning the damages suffered by PDC as a result of the delay in delivery and the failure of the pump packages to operate as expected once they were delivered and installed on Rig 14, and a document prepared by him with his calculations was admitted into evidence.  These damages consist of the cost of renting pumps while awaiting delivery of the pump packages and lost revenue from the expected delivery date of December 13, 2011, until Rig 14 became operational on February 2, 2012, and the costs of repairs after the pumps were installed.

In light of the Court's finding that there was no breach regarding the date of delivery, PDC is entitled to neither its rental costs prior to delivery of the ORF pump packages nor to lost revenues during this period.  Rather, PDC is entitled to lost revenues for the time it was waiting on the new pumps to be repaired and become operational, that is, beginning January 24, 2012, and continuing until 10:00 a.m. on February 2, 2012, and to its repair costs.  PDC's calculation of lost revenues was testified to by Farmer and is not disputed by ORF.  It is based upon the loss of two types of revenue from Apache: a day rate of $20,000.16 and per diem of $75.00 for eleven men, totaling $825.00.  These rates, multiplied by the days Rig 14 was out of service, come to $195,759.84, and PDC is entitled to damages in this amount for lost revenue resulting from the problems with the installed pump packages. The undisputed evidence indicates that PDC's repair costs total $59,046.89, and PDC is entitled to this amount as well.

17

ORF will be awarded damages on its counterclaim in the amount of $252,640.00, the total due on the four invoices.  In its memorandum, ORF has also argued that it is entitled to an award of attorney's fees on its counterclaim.  Any request for attorney's fees must be made by separate motion in accordance with Fed. R. Civ. P. 54(d)(2).

In considering whether to file a motion for attorney's fees, ORF is advised that the Court has serious questions as to whether such an award would be appropriate or just under the facts of this case.  Based on the evidence, ORF did not even create invoices 3808 and 3809, dated November 4, 2011, until at least June 2012, approximately seven months after the repairs, and ORF made no demand on PDC until October 2012, almost one year after the repairs.  Further, when ORF finally made demand on the invoices (invoices 3808, 3809, 3746, and 3802) totaling $252,640.00, ORF failed to provide PDC with information sufficient for PDC to determine whether it actually owed ORF on the invoices.  Understandably, PDC requested more information, but ORF failed to provide it.  Legitimate fact issues existed in this case, necessitating a decision by the Court as to whether the subject work had actually been performed by ORF and if so, whether PDC owed on these invoices.  Although this court has ultimately found that ORF proved its case on these invoices by a preponderance of the evidence, PDC presented credible evidence and defenses and was clearly justified in refusing to pay these invoices in the absence of a decision by a court.  Further, the majority of this case pertained to PDC's claims against ORF, not ORF's counterclaim, and any award of ORF's attorney's fees related solely to its counterclaim would likely be minimal (if allowed at all).

## VI. CONCLUSION

PDC is awarded damages on its claim of breach of the implied warranty of merchantability in the amount of $254,806.73. ORF is awarded $252,640.00 on its counterclaim. A separate judgment will be entered.

SO ORDERED AND ADJUDGED, this the 3rd day of November, 2016.

/s/ F. Keith Ball
UNITED STATES MAGISTRATE JUDGE
